# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **VICTORIA D. REDMAN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00080 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

 

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand this case for an award of benefits.

## I. Background and Standard of Review

Plaintiff, Victoria D. Redman, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:06-cv-00080-PMS   Document 14   Filed 05/30/07   Page 1 of 23   Pageid#: 52

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Redman protectively filed her applications for SSI and DIB on or about January 26, 2005, alleging disability as of January 12, 2005.[2] (Record, ("R."), at 78-80, 86, 119, 374-77.) The claims were denied initially and on reconsideration. (R. at 62-64, 66, 68-70.) Redman then requested a hearing before an ALJ. (R. at 73.) The ALJ held a hearing on March 22, 2006, at which Redman was represented by counsel. (R. at 28-59.)

By decision dated April 24, 2006, the ALJ denied Redman's claims. (R. at 17-26.) The ALJ found that Redman met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2005.[3] (R. at 19.) The ALJ found that

---

[2]Redman's Disability Report, which should contain her alleged disabling impairments, is not contained in the record. In her Disability Report - Appeal, Redman noted problems with her knees and hip pain. (R. at 86.)

[3]In order for Redman to be entitled to DIB benefits, she must demonstrate a disability impairment on or prior to June 30, 2005.

-2-

Redman had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.)  The ALJ found that the medical evidence established that Redman had severe impairments, namely residuals of a left hip fracture with surgical repair, obesity, adjustment disorder and social phobia, but he found that Redman's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 19, 22.)  The ALJ also found that Redman's allegations regarding her limitations were not totally credible. (R. at 23.)  The ALJ found that Redman retained the functional capacity to perform simple, sedentary,[4] unskilled work, diminished by an inability to climb ladders, ropes and scaffolds, an occasional ability to climb ramps and stairs, to kneel, to crouch and to crawl and a need to avoid exposure to work in hazardous areas such as near moving machinery and heights.  (R. at 22.)  Thus, the ALJ found that Redman could not perform her past relevant work.  (R. at 24.)  Based on Redman's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Redman could perform jobs existing in significant numbers in the national economy, including those of a credit authorizer, a materials and services order clerk, a food checker, a surveillance monitor, a newspaper cutter/paster and a garment folder.  (R. at 25.)  Therefore, the ALJ found that Redman was not under a disability as defined in the Act, and that she was not eligible for benefits.  (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

After the ALJ issued his decision, Redman pursued her administrative appeals, (R. at 12-13), but the Appeals Council denied her request for review.  (R. at 6-9.)

---

[4]Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying or articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2006).

Redman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on the Commissioner's motion for summary judgment filed December 13, 2006.[5]

## *II. Facts*

Redman was born in 1984, (R. at 78), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Redman has a high school education and past work experience as a commercial cleaner, a counter waitress and a retail stock clerk. (R. at 32-35, 53.)

Redman testified that she was enrolled in special education classes through the tenth grade due to difficulty reading and attention deficit disorder, ("ADD"). (R. at 31-32.) Redman testified that she had not worked since January 12, 2005, when she was involved in a motor vehicle accident that resulted in a broken hip and pelvis. (R. at 32, 36.) She stated that, at that time, she was working as a commercial cleaner and a retail stock clerk. (R. at 32.) Redman testified that she took prescription pain medication until December 2005, at which time she began taking over-the-counter pain medication. (R. at 40-41.) She stated that her leg "always hurts." (R. at 41.) Redman estimated that she could walk and stand for approximately 10 minutes and that she could sit for up to 20 minutes. (R. at 41.) She stated that she could pull her left leg up to only approximately 45 degrees, at which point she had to manually pull it with her hands, which was painful. (R. at 42.) Redman testified that she

---

[5]Redman did not file a motion for summary judgment.

experienced swelling in her ankles and knee. (R. at 43.) She stated that she could not bend over to tie her left shoe. (R. at 43.) Redman testified that she watched television during the day and read books to her two-year-old daughter. (R. at 46-47.) She stated that she was able to prepare microwavable meals and "pick up" around the house during the week, including doing some laundry. (R. at 47.) Redman stated that she performed 15 minutes of home exercises daily. (R. at 49.) She testified that she no longer drove, but that friends took her places. (R. at 51.)

Redman testified that she experienced flashbacks and nightmares related to the motor vehicle accident. (R. at 43-44.) She stated that she experienced crying spells. (R. at 44.) Redman testified that she had always had difficulty meeting people and dealing with people, explaining that she was shy and bashful. (R. at 44.) She stated that she preferred to stay at home and had only two friends. (R. at 44-45.) She stated that, other than these two friends and family members, she was uncomfortable talking with people. (R. at 45.) Redman further stated that she struggled with depression. (R. at 45.) Redman testified that, at the time of the hearing, she was completing various paperwork for her former employer approximately six hours each month in order to qualify for rental assistance. (R. at 45-46.) She stated that she saw a counselor monthly. (R. at 52.)

Paula Day, a vocational expert, also was present and testified at Redman's hearing. (R. at 52-58.) Day classified Redman's past work as a commercial cleaner as heavy[6] and unskilled, her work as a retail stock clerk, as performed by Redman, as

---

[6]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d)

Case 1:06-cv-00080-PMS   Document 14   Filed 05/30/07   Page 5 of 23   Pageid#: 56

medium[7] and semiskilled and as a counter waitress as light[8] and unskilled. (R. at 53.) Day testified that Redman's skills as a cashier/stock clerk would transfer to the semiskilled, sedentary jobs of a credit authorizer, a materials and services order clerk and a food checker. (R. at 54.) Day was asked to consider a hypothetical individual of Redman's age, education and work history who had the limitations as set forth in psychologist Tessnear's narrative report. (R. at 54.) Day testified that such an individual could not perform the sedentary jobs previously identified. (R. at 54-55.) However, Day testified that the same individual could perform the unskilled, sedentary jobs of a surveillance system monitor, a newspaper cutter/paster and a garment folder. (R. at 55.) Day further testified that Redman's reading difficulty would not preclude performance of these jobs. (R. at 55.) Day stated that an individual who had to miss more than two days of work monthly could not maintain substantial gainful employment. (R. at 56.) Day testified that an individual with the limitations set forth in psychologist Tessnear's mental assessment would not be able to maintain substantial gainful employment. (R. at 56-57.)

In rendering his decision, the ALJ reviewed records from Wythe County Public Schools; Wythe County Community Hospital; Wellmont Bristol Regional Medical Center; West Ridge Orthopaedic & Surgical Specialists; Dr. Randall Hays, M.D., a

---

(2006).

[7]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

[8]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Carilion Family Medicine; Dr. John W. Carmody, M.D.; Dr. William M. Tomiak, M.D.; Steven B. Mayhew, Ph.D., a licensed consulting psychologist; Mount Rogers Community Counseling Services; Heartland Rehabilitation Services; and Pamela S. Tessnear, Ph.D., a licensed clinical psychologist.

On November 21, 1996, when Redman was 12 years old, Steven B. Mayhew, Ph.D., a licensed consulting psychologist, completed a psychological evaluation, diagnosing Redman with attention deficit hyperactivity disorder, ("ADHD"), combined type. (R. at 260-61.) Testing revealed that Redman was then functioning at a fourth-grade reading level, a third-grade spelling level and a fourth-grade arithmetic level. (R. at 261.) Mayhew recommended that Redman begin taking Ritalin. (R. at 261.)

On January 12, 2005, Redman was admitted to Wellmont Bristol Regional Medical Center after being involved in a motor vehicle accident. (R. at 181-99.) She suffered a dislocated left hip, a left acetabular fracture, a right superior pubic rami fracture and a fracture of the left third finger. (R. at 185.) Redman underwent a closed reduction of the left hip and Bucks traction. (R. at 181.) She was discharged on January 27, 2005, with instructions to continue traction and to remain on bedrest. (R. at 181.)

Redman saw Chris Castle, a nurse practitioner for Dr. William M. Tomiak, M.D., on February 23, 2005, for a follow-up of her hip fracture. (R. at 246-48.)

-7-

Castle noted that Redman had benefitted greatly from traction. (R. at 246.) It was noted that Redman had been extremely depressed because she was unable to care for her infant. (R. at 247.) Redman had good sensation and good range of motion of the ankle and foot, and she had good pulses. (R. at 247.) She denied any specific pain upon palpation to the lower extremity, but some pain and tenderness was noted at the bilateral knees. (R. at 247.) Castle noted that Redman was maintained very well and was progressing in a positive manner. (R. at 247.) Castle prescribed Lexapro for depression and Vicodin for pain. (R. at 248.) Castle noted that Redman had done extremely well thus far and seemed to be doing much better with pain control. (R. at 248.) On March 7, 2005, a physical examination revealed that Redman was neurovascularly intact and her extremity length was good. (R. at 253.) The pin was removed from Redman's tibia, and x-ray following removal showed good position and alignment. (R. at 253.) Traction was discontinued and she was advised not to walk, but to continue moving her hip. (R. at 253.) On March 22, 2005, when Redman called Castle and asked for a transfer to a local orthopedist, she was sent to Dr. Paul Morin, M.D. (R. at 255.)

On March 21, 2005, Dr. Randall Hays, M.D., a state agency physician, completed a physical assessment, indicating that Redman could perform light work diminished by an ability to stand and/or walk for at least two hours in an eight-hour workday and a limited ability to push and/or pull with the lower extremities. (R. at 204-12.) Dr. Hays further found that Redman could never climb ladders, ropes or scaffolds, could occasionally climb ramps and stairs, kneel, crouch and crawl and could frequently balance and stoop. (R. at 207.) Dr. Hays imposed no manipulative, visual or communicative limitations, but he found that Redman should avoid all

-8-

exposure to hazards such as machinery and heights.  (R. at 207-09.)  Dr. Hays noted that Redman's limitations were fully credible at that time, but would be only partially credible at the end of 12 months.  (R. at 210.)  These findings were affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on June 9, 2005.  (R. at 211.)

On April 6, 2005, Redman saw Dr. Paul Morin, M.D., with West Ridge Orthopaedic & Surgical Specialists, at the referral of Dr. Tomiak.  (R. at 202-03.) Redman's medications at that time included Lovenox, Vicodin and Lexapro.  (R. at 202.)  Dr. Morin noted that Redman had been in traction for seven and one-half weeks following the motor vehicle accident, but had not had any physical therapy since being discharged from the hospital.  (R. at 202.)  Redman exhibited marked loss of motion of the hip and knee.  (R. at 203.)  Dr. Morin asked Redman to see a physical therapist immediately to being range of motion exercises.  (R. at 203.)  Redman began physical therapy at Heartland Rehabilitation Services on April 29, 2005, at which time her prognosis was rated as good.  (R. at 350.)  On May 9, 2005, Dr. Morin noted that Redman was doing better and was walking with a walker.  (R. at 201.)  Dr. Morin opined that she was doing relatively well and advised her to continue to work aggressively with physical therapy.  (R. at 201.)

On May 18, 2005, Redman requested a refill on her pain medication.  (R. at 258.)  Dr. Morin did not approve the refill and noted that no further care through his office with prescriptions for pain medication, physical therapy or other services would be provided except in the event of a true emergency.  (R. at 258.)

-9-

On June 7, 2005, Redman saw Dr. Tomiak, her primary care physician, for a physical therapy referral. (R. at 233.) She stated that physical therapy under Dr. Morin's care was discontinued after her mother "cursed him out." (R. at 233.) A physical examination revealed a limited range of motion at the left knee secondary to mild effusion and pain. (R. at 234.) Redman was prescribed hydrocodone. (R. at 234.)

On June 13, 2005, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Redman had a nonsevere affective disorder, namely depression, not otherwise specified. (R. at 213-27.) Jennings found that Redman experienced mild restrictions in activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 223.) Jennings noted that Redman's allegations were not fully credible. (R. at 227.)

On July 7, 2005, Redman saw Dr. John W. Carmody, M.D., for an evaluation of left hip and knee pain. (R. at 238-40.) Dr. Carmody noted that she used a crutch. (R. at 238.) Physical examination revealed full distal neurovascular function and full extension and active flexion of the left knee to 100 degrees. (R. at 239.) A slight decrease in active flexion of the left hip was noted, but Redman exhibited good internal/external rotation of the left hip. (R. at 239.) Deep tendon reflexes were 2+ and symmetric. (R. at 239.) She was alert and fully oriented, and her affect was within normal limits. (R. at 239.) X-rays of the pelvis revealed a healed acetabular fracture of the left hip, well-maintained hip joints bilaterally and no evidence of

-10-

dislocation or acute fractures.  (R. at 239.)  Redman was advised to continue physical therapy and use of a crutch.  (R. at 239.)  An MRI of the left hip, taken on July 20, 2005, showed a bone contusion involving the superior/posterior portion of the left femoral head and the corresponding portion of the acetabulum posteriorly.  (R. at 259.)

On July 29, 2005, Dr. Carmody noted that an MRI showed no evidence of fracture or dislocation, but some mild hyperemia in the acetabulum and the femoral head.  (R. at 241.)  He noted that, clinically, Redman continued to improve, and he noted that she had been fitted with a support to equalize leg lengths.  (R. at 241.)  Dr. Carmody opined that she had markedly improved symptomatology, and he advised her to continue with her therapy regimens.  (R. at 241.)  On August 25, 2005, Dr. Carmody noted that Redman's left hip was markedly less painful, and the range of motion of the knee was improving with flexion to 110 degrees.  (R. at 242.)  A physical examination revealed full extension of the left knee with flexion beyond 110 degrees.  (R. at 242.)  A pelvic x-ray showed no clear evidence of avascular necrosis and was stable.  (R. at 242.)  Redman was advised to continue her current regimen and to partially weightbear with crutches.  (R. at 242.)

On September 21, 2005, Redman saw Dr. Tomiak with complaints of obesity and fatigue.  (R. at 231.)  Dr. Tomiak noted that Redman walked with a limp.  (R. at 232.)  She did not complain of any pain related to her hip or knee.  (R. at 231-32.)

Redman saw Dr. Carmody on October 19, 2005, for a follow-up of her left hip dislocation.  (R. at 263.)  It was noted at that time that Redman's left hip was

-11-

markedly less painful and range of motion of the knee was improving with flexion to 120 degrees. (R. at 263.) She complained of stiffness in the left hip. (R. at 263.) A physical examination showed that Redman had achieved full extension in the left knee with flexion beyond 120 degrees, full distal neurovascular function in the lower extremities, a slight decrease with external rotation of the left hip and a limping gait. (R. at 263.) A pelvic x-ray continued to demonstrate no clear evidence of avascular necrosis and was stable. (R. at 263.) Redman was advised to continue with home stretching exercises, continue her then-current physical therapy regimen and use a cane. (R. at 263.) On November 1, 2005, Redman requested a prescription for Tylenol #3, but Dr. Carmody deferred management of her pain medications to Dr. Tomiak. (R. at 264.) Instead, Dr. Carmody suggested that Redman use Motrin. (R. at 264.) On November 30, 2005, after being informed by Heartland Rehabilitation Services that Redman had reached a plateau in her therapy, Dr. Carmody allowed her to be discharged with a home exercise program. (R. at 265.)

On December 6, 2005, Redman was seen at Wake Forest University Baptist Medical Center for complaints of a lump on the side of her neck. (R. at 360-61.) During the physical examination, it was noted that the strength in Redman's lower extremities was full. (R. at 360.) It also was noted that her balance was good. (R. at 360.)

Redman saw Nora King, a licensed clinical social worker at Mount Rogers Community Counseling Services on December 12, 2005, for a psychosocial assessment. (R. at 267-74.) Redman referred herself for the treatment of depression and anxiety. (R. at 267.) Her affect/mood were described as flat, sad, irritable and

anxious.  (R. at 268.)  She related that she experienced insomnia, low self-esteem, decreased appetite and memory impairment.  (R. at 268.)  Redman denied suicidal or homicidal ideation, but expressed feelings of depression and hopelessness.  (R. at 269.)  Redman reported that she had no difficulty with meal preparation, housekeeping, taking her medication, shopping, ability to access resources, social skills, self care/hygiene, doing laundry or transporting herself places.  (R. at 270.)  Redman was diagnosed with major depression, severe, single episode, no psychosis, anxiety disorder, not otherwise specified, and a then-current Global Assessment of Functioning, ("GAF"), score of 40.[9]  (R. at 273.)  King recommended that Redman undergo counseling for 12 weeks.  (R. at 273-74.)  Redman again saw King on January 19, 2006.  (R. at 362.)  King noted that Redman was very talkative with unremarkable thought processes.  (R. at 362.)

Pamela S. Tessnear, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Redman on March 15, 2006, at the request of Redman's attorney.  (R. at 363-71.)  Redman stated that the only medication she was using at that time was Motrin.  (R. at 364.)  Redman reported seeing King at Mount Rogers and stated that it was not helpful.  (R. at 364.)  She stated that she had never experienced psychiatric difficulties prior to the accident.  (R. at 364.)  Redman reported that, immediately following the accident, she experienced nightmares and flashbacks, but she stated that these symptoms had lessened.  (R. at 365.)  She stated

_____

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..."  DSM-IV at 32.

-13-

that she had difficulty focusing and concentrating. (R. at 365.) Redman described herself as shy and stated that she did not like to do things in front of people. (R. at 367.) She stated that she had two close friends and did not participate in organized activities or attend church. (R. at 367.) Tessnear noted that Redman was friendly and cooperative and was able to relate in a straightforward manner. (R. at 368.)

Tessnear administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Redman achieved a verbal IQ score of 84, a performance IQ score of 99 and a full-scale IQ score of 90, placing her in the average to low average range of intellectual functioning. (R. at 367.) Tessnear also administered the Wide Range Achievement Test-Third Edition, ("WRAT-3"), on which Redman achieved a fifth-grade reading score, a sixth-grade spelling score and a sixth-grade arithmetic score. (R. at 368.)

Tessnear diagnosed Redman with social phobia, adjustment disorder with mixed anxiety and depressed mood and a then-current GAF score of 60.[10] (R. at 370.) Tessnear noted that Redman's depressive symptoms were mild and appeared directly related to the accident. (R. at 370.) She displayed a very significant fear of evaluation, becoming anxious when asked to perform in front of others. (R. at 370.) Tessnear opined that Redman's anxiety and depression related to the accident and would continue to subside unless her condition deteriorated or she believed she would not be able to return to an acceptable level of functioning. (R. at 371.) However, Tessnear opined that Redman's social anxiety would not be expected to improve

---

[10]A GAF of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

-14-

without intervention. (R. at 371.) Tessnear noted that Redman would have much difficulty with work that was observed and evaluated by others, and she noted that she could function best in situations in which her work was done alone or with a trusted co-worker, but not in a group setting in which others depended on her. (R. at 371.) Tessnear opined that Redman could work with the public performing rote activities and could accept supervision. (R. at 371.) Tessnear further opined that Redman could perform simple and repetitive tasks and might be able to manage more complex or detailed instructions if she was not in a situation that activated her social anxiety. (R. at 371.) Tessnear noted that Redman was able to deal with most usual work stresses and to maintain fair attention and concentration. (R. at 371.) Tessnear recommended that Redman pursue structured treatment for her social anxiety. (R. at 371.)

Tessnear also completed a mental assessment, concluding that Redman had an unlimited or very good ability to follow work rules, a good ability to relate to co-workers, to use judgment, to interact with supervisors, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 372-73.) She found that Redman had a fair ability to deal with the public, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed and complex instructions and to relate predictably in social situations. (R. at 372-73.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims.

*See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 24, 2006, the ALJ denied Redman's claims. (R. at 17-26.) The ALJ found that Redman met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2005. (R. at 19.) The ALJ found that the medical evidence established that Redman had severe impairments, namely residuals of a left hip fracture with surgical repair, obesity, adjustment disorder and

social phobia, but he found that Redman's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19, 22.) The ALJ found that Redman retained the functional capacity to perform simple, sedentary, unskilled work, diminished by an inability to climb ladders, ropes and scaffolds, an occasional ability to climb ramps and stairs, to kneel, to crouch and to crawl and a need to avoid exposure to work in hazardous areas such as near moving machinery and heights. (R. at 22.) Thus, the ALJ found that Redman could not perform her past relevant work. (R. at 24.) Based on Redman's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Redman could perform jobs existing in significant numbers in the national economy. (R. at 25.) Therefore, the ALJ found that Redman was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

Redman argues that the ALJ erred by rejecting the findings of psychologist Tessnear. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-11.) Redman further argues that the ALJ erred by failing to consider the combined effect of her impairments in determining that she was not disabled. (Plaintiff's Brief at Plaintiff's Brief at 11-12.) Next, Redman argues that the ALJ erred by relying on a hypothetical to the vocational expert that did not include all of the facts. (Plaintiff's Brief at 9-11.) Finally, Redman argues that the ALJ erred by considering only her ability to perform activities within the home, not outside of the home. (Plaintiff's Brief at 11.)

As stated above, the court's function in this case is limited to determining

-17-

whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In his decision, the ALJ noted that he was according little weight to Tessnear's mental assessment because it was inconsistent with her narrative report and because Tessnear relied "quite heavily" on Redman's subjective allegations of symptoms and limitations. (R. at 24.) The ALJ further noted that Redman saw Tessnear, not in an effort to obtain treatment for a mental impairment, but at the request of her attorney to obtain evidence for the appeal currently before this court. (R. at 24.) For the following reasons, I find that substantial evidence does not support the ALJ's

weighing of the evidence.

I first note that Tessnear did not rely "quite heavily" on Redman's subjective allegations regarding her limitations but, instead, administered objective testing during her evaluation of Redman, including the WAIS-III and the WRAT-3. The results of such testing were deemed valid. The WAIS-III revealed that Redman was functioning in the average to low average range of intelligence. (R. at 367.) The WRAT-3 revealed that Redman had a fifth-grade reading ability, a sixth-grade spelling ability and a sixth-grade arithmetic ability. (R. at 368.) Tessnear further conducted a mental status examination during which she observed Redman's behavior. (R. at 368-70.) Among other things, she observed that Redman's attention and concentration were fair and that Redman was "quite anxious" during testing. (R. at 369.) Likewise, Tessnear observed that testing to rate Redman's abstract reasoning abilities made her very nervous and self-conscious about her answers. (R. at 370.) Tessnear noted that Redman displayed a very significant fear of evaluation, becoming anxious when asked to perform in front of others. (R. at 370.) Tessnear concluded that Redman would have much difficulty at any work observed and evaluated by others and, thus, could function best in situations in which her work was done alone or with a trusted co-worker. (R. at 371.) She further concluded that Redman could work with the public performing rote activities and could accept supervision, that she could perform simple and repetitive tasks and that she might be able to manage more complex or detailed instruction if she was not in a situation that activated her social anxiety. (R. at 371.) Lastly, Tessnear concluded that Redman was able to deal with most usual work stresses and to maintain fair attention and concentration. (R. at 371.)

I find that Tessnear's mental assessment, in which she concluded that Redman had an unlimited or very good ability to follow work rules, a good ability to relate to co-workers, to use judgment, to interact with supervisors, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to demonstrate reliability and a fair ability to deal with the public, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed and complex job instructions and to relate predictably in social situations, is not inconsistent with her narrative report. In fact, I find just the opposite, that Tessnear's mental assessment of Redman is corroborated by her narrative report and that her findings were based on objective test results and personal observations of Redman, not mostly on Redman's subjective allegations of her limitations.

Moreover, I find that Tessnear's findings are supported by the other evidence contained in the record. For instance, there is clear documentation contained in the record that Redman was diagnosed with ADHD as a child, for which she was treated with medication. Moreover, although Redman graduated from high school with a standard diploma, she was enrolled in special education classes through at least the tenth grade. Redman's school records indicate that she received poor grades in several classes. Furthermore, Redman's activities of daily living do not contradict Tessnear's findings. For instance, Redman stated that she performed some household chores with breaks and with the assistance of others, cared for her young child with the help of the father, bathed every other day due to physical difficulties, shopped occasionally with assistance, listened to music, watched television, crocheted and sewed. (R. at 366.) She stated that she had a couple of good friends, but did not

-20-

participate in organized activities and did not attend church. (R. at 366-67.) I find that there is nothing about these reported activities of daily living that is inconsistent with Tessnear's findings. I note that the record reveals that Redman has been prescribed Lexapro for depression and has been participating in counseling since December 2005. Her GAF scores have ranged from 40 in December 2005, indicating major impairment, to 60 in March 2006, indicating moderate symptoms.

Lastly, I note that although Tessnear's findings are not supported by the findings of state agency psychologist Jennings, Jennings based her findings solely on Redman's medical records. She performed no objective testing and did not have the opportunity to examine Redman or observe her behavior as Tessnear did. While Tessnear is not considered a treating source under the regulations, she had more contact with Redman than Jennings did.

For all of these reasons, I find that substantial evidence does not support the ALJ's decision to accord little weight to the findings contained in the mental assessment completed by Tessnear.

Redman next argues that the ALJ erred by relying on the vocational expert's response to a hypothetical question that did not fairly set out of all her impairments. (Plaintiff's Brief at 9-11.) I agree. It is well-settled that testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The Commissioner may not

rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979). Here, the testimony of the vocational expert upon which the ALJ relied in determining that Redman could perform jobs existing in significant numbers in the national economy was premised upon the limitations contained in Tessnear's narrative report. The ALJ specifically rejected the vocational expert's testimony that an individual who was limited as set forth in Tessnear's mental assessment would not be able to work. However, given the above finding that substantial evidence does not support the ALJ's decision to accord little weight to Tessnear's mental assessment, I find that substantial evidence does not support the ALJ's finding that jobs existed in significant numbers in the national economy that Redman could perform. Put simply, the vocational expert's testimony upon which the ALJ relied was based upon a hypothetical that did not fairly set out all of Redman's impairments. Furthermore, when a hypothetical, including the limitations placed on Redman by Tessnear, was put to the vocational expert, the expert stated there were no jobs available that Redman could perform.

Next, Redman argues that the ALJ erred by failing to consider the combined effect of her impairments. Again, I agree. It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity. ... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. Additionally, "the ALJ must adequately explain his or her evaluation of the combined effect of impairments." *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). Nowhere in the ALJ's decision did he state, either implicitly or explicitly, that he had

considered the combined effect of Redman's impairments on her work-related abilities. Thus, for this reason as well, I find that substantial evidence does not support the ALJ's disability finding.

Given the above findings, I further find it unnecessary to address Redman's remaining argument that the ALJ erred by considering only her activities within the home in finding that she was not disabled.

*IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, and the court will vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for an award of benefits.

An appropriate order will be entered.

DATED:      This 30th day of May 2007.


/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE